The next case on the calendar is Forrest v. New York State Office of Mental Health. Good morning, Your Honors. May it please the Court, my name is Kyle Pulis and I represent the Plaintiff Appellant in this matter. Your Honors, I believe the main issue on this appeal is whether or not the Plaintiff has established a causal link or a causal connection between her protected activities and the alleged adverse acts that were taken against her. I believe the record demonstrates thoroughly that she has established that under both the direct evidence test as well as the indirect evidence test. As far as direct evidence is concerned, there's testimony from coworkers, specifically Garrick Jackson, that one of the supervisors who was initially named in one of the first complaints of discrimination, Sue Ann Smith, had, in a conversation with Garrick Jackson, referred to the complaint as crap and showed displeasure that she did not like it and she did not like that she was a part of it. We maintain that that, in and of itself, establishes some direct evidence of a retaliatory motive. Also, in the record, there's testimony from Garrick Jackson, as well, that in conversations he had with Richard Parks, who was also a coworker of Plaintiff's. Why isn't that hearsay? His conversation with Richard Parks. Parks isn't a defendant here. That's right, Your Honor. And he's not a supervisor, either. So why is that relevant and why isn't it hearsay? I believe that, Your Honor, that's correct. It may create a hearsay issue. Richard Parks is explaining conversations that he had with the supervisors. So you're then not relying on that as direct evidence? I'm not relying on that as direct evidence, Your Honor. Although he was not a supervisor, he did express discontent with the complaints, as well, and he had, during conversations with Mr. Jackson, expressed that he was Mr. Jackson's belief that Richard Parks had, in fact, fabricated certain documents and whatnot in an attempt to set Plaintiff up for termination. None of which is admissible, correct? His thoughts, his opinions about what Mr. Parks did? That's right, Your Honor. I think more importantly is the conversation that Mr. Jackson had with Sue Ann Smith, where she expressed her discontent as a supervisor with the complaints that were brought against her. With what complaints? The April 2012 complaint that was brought with the Division of Human Rights. Well, wasn't what she was complaining about is that she had to back up a supervisor? When you say that she made that complaint, but you don't put the full testimony. What she was complaining about was now she was in the middle of this and she had to back up a supervisor, someone, in fact, the plaintiff sued here, not that she was angry with the plaintiff. Well, Your Honor, I certainly understand that position. I do feel how it... Is that position what the facts show? I think the facts show that she was also named in the Division of Human Rights complaint. And, yes, she thought she expressed her discontent with the fact that she had to back up a supervisor. But that's what she was upset about, not that the complainant had brought the complaint, correct? Well, no, not necessarily, Your Honor. I believe that the testimony demonstrates that she was, in fact, upset about the complaint, which is evident in some of the other acts that were taken against the plaintiff, such as the closer scrutiny, constant review of her charts and her assessments, things that were never carried out or taken against the plaintiff prior to any of her complaints of discrimination. And just aside from direct evidence, I also believe the record demonstrates that there's causation through indirect evidence. Specifically, one argument I'd like to bring is the temporal proximity argument. Now, I know this has been an issue in all the briefs. Initially, my client has brought a claim, an internal complaint of discrimination in March of 2011 and then went out on medical leave until January of 2012. And I know the district court certainly found that. She didn't go out on medical leave right away, right? There was a period of time before she went out on medical leave. I believe the record demonstrates that it was almost immediately after. I know the defense brief states that it was May 2011. I believe plaintiff's testimony that it was almost immediately within a week or two after she had brought the internal complaint. And then I understand she doesn't return to work until January 2012. And certainly, under the caseload, nine or ten months has passed. That is long enough to break that temporal proximity. But our position here is that when she returned to work, that was the first opportunity that her employers and her supervisors had to take any adverse action against her. It's not all that uncommon that in these types of discrimination or retaliation cases, plaintiffs do, in fact, go out on medical leave because of the stress of some of the actions that are taken against them. And when they return, even though a certain period of time may have passed, which by the court's precedent will say it was too long of a time period, the employer takes their adverse acts against them at the first opportunity that they have, which is when they return to work. And that's certainly our position here. And as far as the other adverse acts that were taken against her after the April 12th Division of Human Rights complaint, we feel that they were certainly close in time to that complaint as well. Any further questions, Your Honor? I know I'm over my time here. Thank you. Good morning. May it please the Court. Andrew Reece Davis representing the State Office of Mental Health. My adversary says the only issue is causation, and that is certainly an issue, and it's certainly a reason to affirm the district court's judgment. But there are also other issues that would warrant affirmance. Ms. Forrest did not meet her burden to show that any of these purportedly retaliatory acts were material, and they were not as a matter of law. Can you address that point for me? Because there are a number of incidents, and they seem to vary in potential severity. So how are we to understand that, looked at cumulatively, they're not material adverse acts? Your Honor, this is very much like what happened in this Court's decision in Tepperween. In that case, there were, Judge Chin said, nine allegations, nine allegedly retaliatory acts. And what the Court said is you can't just add up trivial, nonmaterial acts and say, now here they are in total material in gross. Of course, there are cases where that is possible. I mean, Judge Chin's decision actually in Vega is an example of that, where the teacher experiences a number of acts that are significant, but perhaps it's together. That's on the context. That's right, Your Honor. What we have here is seven alleged acts. I think only one of them really, the discipline for falsifying patient charts, we would say, we would agree that that's not trivial, but that's just reasonable enforcement of an existing policy. And so the others, we think, just don't add up to anything. With respect to the acts that occurred before April 20th, 2012, that are said to be in retaliation for the earlier complaint, the judge did not reach the issue of whether those were adverse actions, correct? That's right, Judge. Now, can this court reach, is it your view, that you're advocating to us that they don't constitute adverse actions, correct? That's right, Judge. It's an alternative ground for affirmance. It was fully briefed to the district court. The material is all in the record to allow this court to make that decision as a matter of law,  both on summary judgment and in addressing Rule 50 post-trial motions. So the court doesn't need to reach it, but could reach it, and if it does reach it, should determine that these acts are not material. If I could address two of the things that my adversary said, I think Judge Ahman asked about the temporal proximity of these acts that happened right after Ms. Forrest's return to work in January of 2012, and my adversary said that it was immediately after the internal complaint that she went on leave. That's not right. The evidence in the record is that it was in early March of 2011 that Ms. Forrest first contacted the Affirmative Action Department to make her complaint. That's in the appendix of 43 to 44. It's her allegation in the complaint. And she says that immediately the retaliation started. There's an allegation of counseling March 9. There's an allegation of a counseling memorandum March 23, and she says that these being written up for minor infraction starts immediately. She doesn't go on medical leave until May, and that's clear from her verified DHR complaint, which is in the appendix at 332. And I can also direct the court to page 678 of the appendix. And this is just a record. But on her causation argument, I mean, there's a way of looking at this, which she says, I was discriminated against. I had all these discriminatory acts in between this time, between, I guess, May of 2011 and January of 2012. Then I was away. So all of those eight or nine months, nothing could have happened. And the moment I came back, they started up again. So what I would say to that is, first of all, this was never raised. I'm talking about the causal connection. No, I understand, Your Honor. This was never raised below. I will say that there is no evidence that the supervisors were, for example, plotting to retaliate against her as soon as they had the opportunity. And that was the fact pattern in the ISTAR case that my adversary relies upon. And, in fact, the internal complaint was resolved against Ms. Forrest and in favor of the supervisors in September of 2011. So it's not as though she comes back in January and there's still this complaint hanging over the supervisors. The complaint is gone and resolved in favor of the supervisors by that point. And, of course, the causation issue is only one of the issues here. We have the materiality problem. And we also have the fact that the office has proffered legitimate nondiscriminatory reasons. What about the lunch policy? I didn't understand the evidence that's in the record on that. There's some testimony that suggests that you were lost pay if you took time off to go pick up lunch, and that that was only enforced against her? Right, Your Honor. What the evidence is on this, and I'll direct the Court to page 168 of the appendix, there's a longstanding policy that applies not just at the Sullivan Correctional Facility, but across all the facilities that are run by the Central New York region that tries to encourage people to stay within the secure unit so that they're available to be recalled if they're needed. And the way they do that is to say if you want a paid lunch break, you've got to stay inside. It apparently was not being enforced very consistently or very rigorously. And so the evidence is that in early 2012, there is an instruction from central management to all the facilities to just reimplement it across the board. And I'll point the Court in the appendix to page 143, which is Ms. Smith's affidavit at paragraph 30, and page 176, which is Ms. DePue at 15 to 17. And they say that they then reviewed the lunchtime policy with all staff. And even Ms. Forrest testified then that once that had happened, it was a blanket policy that applied to everyone. And that's — Well, what about then what confuses me is Mr. Jackson's testimony that said it only that he went out and Mr. Parks went out and they weren't docked, but she was the only one that they enforced that policy against. Right. And it seems to have been in the summer of 2011 when Ms. Forrest was out, that Mr. Parks was being allowed to leave the facility. That's page 379 of the appendix. That's what Ms. Forrest says. That's her deposition transcript at page 48. And then again, at appendix page 713, it's her statement to the DHR at paragraph 3. So there's no inconsistency here. What seems to have happened is that it wasn't being uniformly or routinely enforced across the board. So he was referring to an earlier period of time? That's how I understand the record, Your Honor, yes. And then finally, Your Honor, just to finish up with the failure of Ms. Forrest to establish pretext, the office has advanced, with respect to those acts for which there's actual evidence they took place, reasons that they are justified in the context of this unit that houses the most seriously mentally ill maximum security prisoners. And there's just no admissible evidence that's been adduced in response that could allow a jury to find properly that these explanations are pretextual. So unless the Court has further questions, my light just went on, and I'd ask the Court to affirm the district court's judgment. Your Honor, just to address the launch policy, the record demonstrates that while in theory and in writing it may have been a blanket policy, in practice it was not. And the testimony from Garrick Jackson, he's referring to the time period after the DHR complaint was brought in April 2012. So while in writing the launch policy might require all employees to use their own time or be charged their own time if they leave the facility, in practice, that policy was only applied to my client. And the record is clear on that issue. Mr. Jackson himself has testified that it did not apply to him. He was able to leave the facility, and he was not required to charge his own time. Likewise, he testified that others were allowed to leave without charging their own time as well. And just to address some of the nondiscriminatory reasons that defendants have provided, first, as far as the launch policy is concerned, I don't think they've provided any nondiscriminatory reason. The record demonstrates that the policy was only applied to the plaintiff. Second, there are certain phone privileges that were removed from my client during these morning reports and morning meetings. The record demonstrates that it's an essential function of the nurse's job to be able to use or make calls during those meetings. And ---- Make calls to whom? I believe the calls are related to patients, medications, things of that nature. And Mr. Jackson's testimony, he testifies that Ms. Forrest was the only individual who was not allowed to use her phone for those purposes during meetings. I thought it was that all the women couldn't do it, not just ---- Well, it does say females, but it says ---- I'm just paraphrasing the testimony to the best of my memory. It said females, but mostly the complainant, which he was referring to the plaintiff, that it was mostly applied to her, or more so to her than the others. There's been no reason or justification provided by the defendants on that issue. Also, there's evidence in the record that after the complaint, other nurses had acknowledged that Ms. Forrest's charts and assessments were under more scrutiny than they had been prior to her complaint. There's been absolutely no justification provided for the defendants on that issue. The only issue here ---- That testimony came through Steinberg. I don't have the name here. But wasn't that hearsay testimony as well, because she was reporting what somebody else told her who was not a party? Yeah. That was in a written statement by Carla Steinberg Ross, who was a social worker in the facility. But there was also testimony from Mr. Jackson that he personally firsthand witnessed that Ms. Forrest's charts were more subject to be pulled and that the supervisors asked others to closely scrutinize the charts. He testified that he heard a supervisor say to closely scrutinize her charts? Where in the record is that? Not that he heard it, Your Honor, but that he witnessed it firsthand, that the supervisor seemed more, after her complaint, more likely to pull her charts and scrutinize her charts than they were anyone else's. And just as further evidence, Ms. Forrest has testified that she never had any of these issues prior to any of her complaints. So suddenly, after she's complained, now they're pulling her charts, now they're investigating her, now they're scrutinizing her work, whereas prior to her complaints, this was never an issue of hers. Why would that be adverse, that someone simply looking at her charts? Well, I — They do something to her that is improper. Just, you know, looking at her charts more carefully, why is that an adverse employment action? I would agree with you, Your Honor, on that one issue, if that were the sole factor here. I don't think that would constitute an adverse action on its own. But you're saying a whole series of actions that aren't adverse become adverse? Well, what I'm saying is in the aggregate, all the actions taken against her considered in totality, yes, I do believe under the retaliation standard that she has met her burden of alleging that there was adverse actions taken against her. Certainly, the retaliation standard in that regard is different. It's a different burden that has to be met than the discrimination standard as to establishing an adverse action. It's a lower standard. It doesn't have to affect the terms and conditions of her employment, but it certainly in the total — Has it to deter a reasonable employee from filing? Absolutely, Your Honor. And just one last point I'd like to raise, Your Honor. There's an incident regarding a missing syringe of which the defendants have provided a nondiscriminatory or what they state is a nondiscriminatory reason for — She didn't document it. Well, the testimony is a little confusing on this issue, but Rita Hoffman is the nurse who actually conducted the investigation into the alleged missing syringe. And in the record, it's I believe from 601 through 608 of her testimony, it shows that anyone — number one, it was very uncharacteristic of Shelley DePue to have been counting the syringes. Bottom line is that there was — she didn't document it and there was no discipline. There was nothing done to her because of that. Ultimately, there was no discipline. You're right, Your Honor. And she admitted that she did — I guess she threw a syringe away because the patient refused to shot, and she admitted that she didn't document that as she was supposed to do, correct? Well, to a degree, Your Honor, yes, I would agree with that. And certainly the record is — her testimony is clear on that. But the actual documentation, when Rita Hoffman conducted the investigation, it was clear that there was a post-it on the document stating that this had happened or one of these syringes were used on a patient and it was not documented. Not a post-it put there by the plaintiff? It was put there by another nurse prior to Shelley DePue's review of this document. So she — The plaintiff didn't fill out the appropriate paperwork she was supposed to fill out when she threw it away, correct? That would be — that was her testimony, yes, Your Honor, that it was undocumented. That's correct. But — It's hard to see why that wouldn't be trivial or enforcement of reasonable policies. I understand. I think more on this issue is the fact that Rita Hoffman has testified that Shelley DePue had actually altered documentation and changed the syringe count on this form, which I believe to be further evidence that she had a retaliatory motive towards the plaintiff. The record is clear that any nurse who reviewed this documentation and the syringe count could have clearly seen that there was no syringe missing. And the defendants maintain that, and I would not disagree with them at all, that in this situation where it's a correctional facility, there's a very compelling interest in knowing where all the syringes are. And certainly one missing could pose a threat to other inmates as well as staff and security. If that was such a concern of the defendants, why did they wait eight hours to report it to security? It should have been reported immediately, as the testimony demonstrates that the security guards were furious over the fact that it was not reported immediately. So I think that evidence in and of itself goes against or rebuts their compelling interest in securing the facility when, in fact, it took seven to eight hours before the incident was even reported. We have your argument.